VIOLET COLLINS, Plaintiff-Appellant, *v.* HYMAN M. GREENSTEIN, Defendant-Appellee

NO. 6052

MAY 14, 1979

RICHARDSON, C.J., OGATA AND MENOR, JJ.
AND RETIRED JUSTICE KOBAYASHI
ASSIGNED BY REASON OF VACANCY*

---

\* Justice Kidwell, who heard oral argument in this case, retired from the court on February 28, 1979. HRS § 602-11 (1978 Supp.) provides: "After oral argument of a case, if a vacancy arises or if for any other reason a justice is unable to continue on the case, the case may be decided or disposed of upon the concurrence of any three members of the court without filling the vacancy or the place of such justice."

OPINION OF THE COURT BY KOBAYASHI, J.

Plaintiff-appellant, Violet Collins (appellant), initiated a suit in the circuit court of the fifth circuit, Civil No. 1319, alleging professional negligence on the part of defendant-appellee, Hyman M. Greenstein, attorney at law (appellee). This appeal is taken by appellant from an order granting appellee's motion for a directed verdict, and from an order

28

denying appellant's motion for an order granting relief from judgment and for a new trial. Reversed and remanded.

## ISSUE

Whether the trial court erred in granting appellee's motion for a directed verdict on the issue of proximate cause.

## STATEMENT OF THE CASE

Appellant initially filed her complaint on January 18, 1973, alleging that appellee had negligently failed to institute a suit on her behalf against Hawaiian Merchandising Associates, Ltd. (HMA), and First Hawaiian Bank (Bank), and alleging injury resulting from the fact that her claim for relief against HMA and the Bank had been barred by the statute of limitations. On February 13, 1973, appellant amended her complaint, alleging, *inter alia,* that in addition to failing to institute an action against HMA and the Bank, appellee negligently failed to set forth affirmative defenses and failed to answer a request for admissions concerning a collection suit filed against her by the Bank in First Hawaiian Bank v. Collins, Civil No. 915, circuit court, fifth circuit.

The amended complaint set forth in detail appellant's allegations of acts of negligence, malpractice, and breach of contract on the part of appellee. Appellant sought $50,000 in general damages, such special damages as may be proven at trial, including reasonable expectations of recovery in potential lawsuits, $25,000 in punitive damages, and the cost of litigation and reasonable attorney's fees.

Appellant moved to disqualify Judge Alfred Laureta from presiding over the case on the grounds that appellant wished to call Judge Laureta as a material witness regarding the proceedings in Civil No. 915. Specifically, appellant desired to elicit testimony from the judge regarding his denial of appellant's motion to amend her pleadings, and his subsequent denials of her efforts to introduce evidence regarding possible fraud on the part of the Bank or its employees. Judge Laureta denied the motion to disqualify.

At trial, before a jury, appellant attempted to introduce the entire record of Civil No. 915 into evidence, stating that the record was necessary to show appellant's emotional distress each time the court ruled against her regarding the fraud defense she was not allowed to plead. The court refused to admit the entire transcript. However, a portion of the transcript was read into evidence.

At the close of all the evidence, appellee moved for a directed verdict and filed a memorandum in support thereof. The court granted the motion and stated as follows:

[T]he Court finds that there is evidence or questions of fact sufficient to deny the motion on the issues of (1) misrepresentation, undue influence, breach of contract, failure of consideration, and other defenses which defendant urges should have been pleaded as affirmative defenses or even as counterclaims in Civil 915, and (2) the standard of care which Mr. Greenstein should have followed as a competent attorney in preparing the answer to the complaint.

Let us assume, however, that Mr. Greenstein continued to remain as her attorney up to the time judgment was entered against Mrs. Collins in Civil 915. Based upon the state of the evidence, recited earlier, defendant's motion would be denied because there would have been enough evidence to go to the jury.

Suppose Mrs. Collins was unable to obtain new counsel and judgment was entered against her. Would Mr. Greenstein still be liable, that is, is there enough evidence to show, though controverted, that his failure was the proximate cause of the damages she suffered? Perhaps.

But now let us consider additional evidence in this case, and in the light most favorable to her.

1. On February 5th, 1971, Mr. Greenstein withdrew as her attorney. She approved the withdrawal and had to beg Mr. Greenstein for a refund of the $250.00 retainer she had paid him. Whether Mrs. Collins approved the withdrawal voluntarily, or with reservations, or without knowledge if she had to approve or not, or was coerced, no one can deny that at the moment she received a refund of

the $250.00 and her files, she knew that Mr. Greenstein no longer represented her as an attorney. The contractual obligations between them was [sic] cancelled and terminated in the same manner she allegedly cancelled all contractual agreements between herself and the bank and Carter and Croft and Desha.

2. She did not know that Civil 915 was pending against her in the Fifth Circuit Court until she received a letter from the bank's attorney, Mr. Henderson. She then contacted three attorneys and was successful in obtaining the services of Mr. Ross, who made his first appearance as attorney of record on July 23rd, 1971.

3. On that same date, the case was set for trial to commence on August 19, 1971, without objection.

4. On the day of trial, Mr. Ross moved to amend the answer filed by Mr. Greenstein to include affirmative defenses, which motion was denied by the Court, and after trial, judgment was entered against Mrs. Collins.

. . . .

I think no one will question that the burden of proving proximate cause rests with the plaintiff. Upon invitation of Mr. Kagawa to refer to his proposed jury instructions, I have selected two which I believe are appropriate and I quote:

Plaintiff's Proposed Instruction No. 74 — The proximate cause of an injury is that cause which in direct, unbroken sequence, produces the injury, and without which the injury would not have occurred.

. . . .

To these proposed instructions I would add that to prove proximate cause, proof of mere possibility of causation is not sufficient; the circumstances adduced must render reasonably probable the existence of such fact. The evidence must not leave the causal connection a matter of conjecture.

Now as of the time Mr. Ross entered upon the scene as counsel for Mrs. Collins, was he, too, bound by any stan-

dard of professional care which, if properly exercised, would have prevented the outcome in Civil 915?

What is this standard of professional care for an attorney who assumes legal representation after withdrawal of a preceding attorney within the circumstances of this case? On this subject, the Court believes that *Nishi v. Hartwell*, 52 Hawaii 188 (1970), is applicable, and failure of plaintiff to carry its burden in proving the applicable standard by expert testimony forces the question of proximate cause into the arena of conjecture and speculation, if it were to be submitted to the jury for determination.

Based upon the state of the evidence on the issue of proximate cause, the Court finds that as a matter of law, plaintiff has failed to meet the standard spelled out in its own proposed instruction that the defendant was the cause which in direct, unbroken sequence, produces the injury and without which the injury would not have occurred.

Accordingly, the motion for directed verdict is hereby granted.

Appellant moved for an order granting relief from judgment and granting a new trial. After a hearing, the court filed its order denying appellant's motion.

### STATEMENT OF FACTS

On July 23, 1966, appellant entered into a conditional sales contract with HMA for the purchase of fifteen new United States Automatic Merchandising Corporation soft drink vending machines. The total price of the machines was $9,360.00. Appellant paid $2250.00 as a down payment and agreed to pay the balance of $8389.80 in monthly installments of $233.05 for 36 months, commencing on September 1, 1966, to the First National Bank in Lihue, Kauai.[1] On the reverse

---

[1] First Hawaiian Bank became successor in interest to the assets of First National Bank. Hereinafter, First National Bank and First Hawaiian Bank will be referred to synonymously as Bank.

side of the Conditional Sales Contract document, Mr. Donald Carter, Vice President of HMA, had signed a paragraph entitled "Seller's Warranty of Title and Assignment Without Recourse." According to the testimony of Clyde French, Island Vice President of the Bank, the conditional sales contract was assigned to the Bank, and "without recourse" meant that if the Bank sustained a loss on the contract, it could not look to the seller for satisfaction. This contract was later amended to give appellant exclusive vending rights for two years for the island of Kauai from Koloa to Kapaa.[2] On August 24, 1966, appellant executed a Retail Installment Contract with HMA, agreeing to pay to HMA's order at First National Bank, $15,600.00 less $3,750.00 (down payment), in 35 monthly installments of $380.00 each, beginning October 10, 1966.[3] On the same day, HMA, by its vice president, Donald T. Carter, assigned the retail installment contract to the Bank. Mr. French was involved in this transaction.[4]

According to the testimony of appellant, in September, 1966, she became aware that instead of new machines, she was to receive used ones. Furthermore, appellant had not received any of the machines by the end of September as set forth in the contract, and HMA had failed to provide a mechanic to install and provide repair services for the machines, as promised. Appellant testified that she went to see Mr. French at the Bank and requested that he call a meeting with Mr. Carter for the purpose of cancelling her vending machine

---

[2] The amended agreement dated July 29, 1966, and signed by A. H. Croft, President of HMA, also guaranteed, *inter alia*, that HMA would deliver and place machines within 60 days of the date of the amendment.

[3] The record shows that this retail installment contract resulted from a consolidation of appellant's contract and that of Mrs. Emily Dela Torre. Mrs. Dela Torre had also executed a conditional sales contract with HMA for five vending machines and 20 Beechnut candy machines for a total of $6240.00. Mrs. Dela Torre paid $1500 as a down payment on her contract. ·

[4] In a letter dated August 26, 1966, and signed by Mr. Croft (as President of HMA) and Mr. Carter (as Vice President and General Manager of HMA), HMA granted appellant exclusive rights on the soft drink and candy vending machines for the island of Kauai, and confirmed the agreement to locate and install machines and guarantee all parts and labor for one year.

contract. Mr. French testified that prior to October 7, 1966, he was informed by appellant that she was to receive used rather than new machines and that she desired to cancel the contract with HMA.

A meeting was held on October 7, 1966, at the Bank. Mr. French, Mrs. Collins, Mr. Carter, and Mr. Desha, Carter's attorney, were present. According to the testimony of Mr. French, appellant's contract to pay $11,850 was "refinanced." Appellant's contract was reduced to a debt of $1800 to pay for five machines which had already been delivered to Kauai, and appellant's order of fifteen machines was cancelled. The promissory notes executed by Carter were a refund of the down payments paid by appellant. Mr. French testified that he "discussed" the October 7, 1966, contract with appellant; that he did not force or pressure her into signing the contract; that if appellant had not signed the October 7th contract, she would have still been obligated to pay $11,850. Mr. French testified that appellant "probably" did not read the contract before signing it.

Appellant testified that her understanding of the outcome of the October 7th meeting at the Bank was that Mr. Carter would keep the vending machines, that he would be making payments to the Bank, and that she had no further financial obligation to the Bank. Appellant testified that as she was departing from the meeting, Mr. French stopped her and asked her to sign a document, which she signed without reading. She understood the document to be one cancelling her obligations to the Bank.

Several documents in evidence indicate events which occurred subsequent to the October 7th meeting. In evidence was a document, entitled "Retail Installment Contract," for $6240, dated October 7, 1966, and bearing the name of appellant. Of the $6240, $4440 was listed as having been paid as a down payment, leaving $1800 as a balance to be paid in 35 monthly installments of $60 per installment. On the reverse side of this contract, under the paragraph entitled "Sellers Assignor with Recourse and Guaranty", are the name of Donald Carter and the date October 14, 1966. Also in evidence were two promissory notes signed by Donald Carter

and John Desha, dated October 14, 1966, promising that HMA would pay to appellant $1500 and $2250, respectively. In addition, appellant's August 24, 1966, contract was stamped with the words "Paid, October 29, 1966, First National Bank of Hawaii, Lihue Branch."

Appellant testified that about a year after the October 7th meeting, Mr. French contacted her and threatened to put a lien on her property unless she made payments on the October 7th contract. Appellant testified she did make several payments because of Mr. French's threats.

The record shows that on April 30, 1968, appellant filed a complaint against Donald Carter, in Civil No. 24939, in first circuit court to recover monies due on the two promissory notes of October 14, 1966. At that time, Daral G. Conklin represented appellant as her attorney. On July 31, 1968, a default judgment was entered against Donald Carter for $3,750 plus interest and costs, for a total of $4,057.13.

Appellant testified that in October, 1968, she went to see appellee for consultation. According to appellant, appellee represented to her that he would institute legal actions against Mr. French and the Bank.

There is no dispute that appellant sought legal counsel from appellee and that appellee agreed to represent appellant. In March, 1969, appellant wrote a $250.00 check to appellee as a retainer fee. Appellee testified that he met with appellant 20 to 30 times.

The evidence shows that on January 9, 1969, the Bank filed a complaint in the first circuit court on Oahu, Civil No. 26972, to collect the balance remaining on the October 7, 1966, contract. On May 21, 1969, the Bank filed the same complaint in the fifth circuit court on Kauai as Civil No. 915. Appellant testified that appellee failed to inform her of the pending suit, and she first became aware of the Bank's suit against her in Civil No. 915 in July, 1971, when she received a letter from Mr. Henderson, the Bank's attorney in Honolulu, stating that she was to appear in court on July 23, 1971. Appellee testified that when he became aware of Civil No. 915, some time in 1969, he instructed another attorney, James

Krueger, to file a general denial.[5] Appellee testified that he was aware that appellant wanted to sue Mr. French for allegedly defrauding her, but that he was not convinced that she had a meritorious case. When questioned as to his opinion of when an attorney should file an affirmative defense, appellee responded, "When he thinks he can win 'em; when they're not frivolous." Appellee further testified as follows:

> Q. If an attorney were in doubt of the merits of an allegation made by his client pertaining to the defense of a matter he were being sued in, if he were in doubt as to the merits, but in view of his understanding . . . of Rule 8 [HRCP][6] . . . don't you think the better practice under this hypothetical is to allege affirmative defenses?

---

[5] An answer to Civil No. 915 was filed on July 28, 1969, by James Krueger, naming Greenstein & Cowan, Of Counsel. The answer read as follows:

Comes now Violet Collins, defendant above named, and in answer to the Complaint heretofore filed herein, denies each and every, all and singular, the material allegations therein contained.

[6] Rule 8, Hawaii Rules of Civil Procedure (H.R.C.P.), provides in part:
General Rules of Pleading.

. . . .

(b) Defenses; Form of Denials. A party shall state in short and plain terms his defenses to each claim asserted and shall admit or deny the averments upon which the adverse party relies. If he is without knowledge or information sufficient to form a belief as to the truth of an averment, he shall so state and this has the effect of a denial. Denials shall fairly meet the substance of the averments denied. When a pleader intends in good faith to deny only a part or a qualification of an averment, he shall specify so much of it as is true and material and shall deny only the remainder. Unless the pleader intends in good faith to controvert all the averments of the preceding pleading, he may make his denials as specific denials of designated averments or paragraphs, or he may generally deny all the averments except such designated averments or paragraphs as he expressly admits; but, when he does so intend to controvert all its averments, he may do so by general denial subject to the obligations set forth in Rule 11.

(c) Affirmative Defenses. In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches. license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as

A. If you are speaking hypothetically, if you are speaking schoolbook law, yes. If you refer to the specific case where Mrs. Collins wants a count of fraud that I don't believe in, the answer is no, sir.

. . . . .

Q. OK. Would you agree with the general proposition that a reasonable prudent lawyer would allege any and all affirmative defenses when available at the time he files his answer, which are not clearly frivolous or without merit on their face?

A. As a general proposition of law, yes, sir.

The record shows that on March 8, 1971, appellee filed his "Withdrawal of Counsel" form in Case No. 915 with the fifth circuit court. The form was dated February 5, 1971, and also contained the signature of appellant. Appellant testified that she was not coerced into signing the form, and that her $250.00 was returned to her.

Appellant testified that after appellee withdrew from her case, she attempted to find another lawyer. She contacted three lawyers. A portion of the trial transcript of Civil No. 915, admitted into evidence, shows that Mr. Arthur Ross entered an appearance as appellant's counsel on July 23, 1971, and was present to represent her on August 19, 1971, the date set for trial. Mr. Ross moved to amend appellant's answer to allege affirmative defenses.[7] The court denied this motion

---

a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

(d) Effect of Failure to Deny. Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading. Averments in a pleading to which no responsive pleading is required or permitted shall be taken as denied or avoided.

[7] The following colloquy took place before the court:

MR. ROSS: I took this matter over at a relatively late date and after an answer had been filed in this case. It took some time to get the answer, the pleadings, from another attorney who had withdrawn. There are some affirmative defenses that should have been alleged, from my knowledge of this case, and I find that they're not alleged in the answer. The answer is nothing more than a general denial of the material allegations. It sort of leaves the defendant in this case a

and also ruled that pursuant to Rule 36, H.R.C.P., the request for admission was taken as admitted since appellant had failed to answer a request for admission or object thereto. According to the transcript, a statement of readiness was filed by the Bank on July 1st, prior to Mr. Ross' being retained by appellant. On September 17, 1971, the court filed its Findings of Fact and Conclusions of Law, and found appellant liable to the Bank in the amount of $1,432.86, plus interest, costs, and attorney's fees.

---

little bit unprotected, but I do think she has some meritorious defenses that should be allowed to be set forth before the Court factually.

Likewise, a Rule 36 requests for admissions was submitted to counsel and went unanswered apparently. We're only allowed ten days, according to the rules, so there's not much we can do about that, but that too has in many respects defeated the defendant's rights in this case.

I don't know the reason for all of this, but there was a withdrawal about the same time and left the lady somewhat unprotected.

. . . . .

With respect to making amendments after a statement of readiness has been filed, my experience in Hawaii, and particularly in the First Circuit, has been that you can't do it unless you already made your objections to the statement of readiness at the time. And Judge Fukushima has shot me down several times in my attempts to do that in some other cases. So I don't want to get my head hit too hard every time, so I didn't bother, but there are some serious problems in connection with presenting a defense when you don't have the proper allegations in your pleadings.

Affirmative defenses are not meaningful unless you have affirmatively alleged them in the pleadings, and even an amendment at trial wouldn't do you much good, because that takes counsel by surprise and I can understand that. I can understand the reason for the rule and the reason for having to give adequate notice.

But by the time I got the case, most of those prerogatives had already been passed and this lady was sort of stuck with the situation as it existed.

THE COURT: Well, the defendant in this case approved the withdrawal of counsel back in February, 1971. She had ample opportunity to find other counsel up until the time of the setting of this case.

MR. ROSS: I might say this, and it's not within my own knowledge but I think I can understand it. The lady said she saw eight lawyers — and there's some record of seeing two or three of them in my file — none of whom would take the case because of conflict of interest, several of them being in Kauai and one or two of them in Honolulu, and that may be a fact of life that exists, and she asked me on July 23rd to stand up for her and say I would take it, and I didn't get the file until a couple of days later because Greenstein's office just didn't have it right away, so we had to wait to look at it for a couple of days.

OPINION·

I. WHETHER THE TRIAL COURT ERRED IN GRANTING APPEL-
   LEE'S MOTION FOR A DIRECTED VERDICT ON THE ISSUE OF
   PROXIMATE CAUSE.

The applicable standard on a motion for directed verdict is
that "the evidence and the inferences which may be fairly
drawn from the evidence must be considered in the light most
favorable to the party against whom the motion is directed
and if the evidence and the inferences viewed in that manner
are of such character that reasonable persons in the exercise
of fair and impartial judgment may reach different conclu-
sions upon the crucial issue, then the motion should be denied
and the issue should be submitted to the jury." *Young v.
Price*, 47 Haw. 309, 313, 388.P.2d 203, 206 (1963); *Farrior v.
Payton*, 57 Haw. 620, 626, 562 P.2d 779, 784 (1977). But,
"where there is no conflict from the evidence and but one
inference can be drawn from the facts, it is the duty of the
court to pass upon the question of negligence and proximate
cause as questions of law." *Young v. Price, supra*, 47 Haw. at
313, 388 P.2d at 206, quoting from *Carreira v. Territory*, 40
Haw. 513, 517 (1954).

The instant action is the type of case that imposes a
burden on a plaintiff, as appellant herein, in conducting "a
trial within a trial," *i.e.* it is necessary for plaintiff to prove
both the attorney's negligence and also what the outcome of
the mishandled litigation would have been if it had been
properly tried.

We consider the issue herein in two parts:

A. Requirement of Expert Testimony.

The trial court's determination, as a matter of law, that
there was insufficient evidence that appellee's conduct was
the proximate cause of appellant's injury was predicated on
the fact that appellant had failed to establish by expert tes-
timony the standard of professional care applicable to the
appellee.

In our opinion, the trial court erred in concluding that expert testimony was necessary, in the instant case, to establish the standard of care of the appellee and that, absent such evidence, appellee's conduct was not, as a matter of law, the proximate cause of appellant's alleged injury.

In *Nishi v. Hartwell,* 52 Haw. 188, 473 P.2d 116 (1970), cited by the trial court, this court stated that the plaintiff in a medical malpractice suit had the burden of proving, by expert medical testimony, the applicable standard of care owed by a physician to a patient under the circumstances revealed by the facts of the case. This court also held that the physician-defendant himself could qualify and serve as an expert witness as to his own standard of care.

Unlike medical malpractice cases, however, cases involving actions against attorneys rarely speak of the need for expert testimony to establish the applicable standard of care. *See, e.g., Smith v. Lewis,* 13 Cal.3d 349, 118 Cal. Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231 (1975); *Freeman v. Rubin,* 318 So.2d 540 (Fla. App. 1975); *Wimsatt v. Haydon Oil Co.,* 414 S.W.2d 908 (Ky. 1967); *Rice v. Forestier,* 415 S.W.2d 711 (Tex. Civ. App. 1967).

Most jurisdictions do not make it an absolute rule that expert testimony be presented to establish the standard of care in all cases involving legal malpractice. *Watkins v. Sheppard,* 278 So.2d 890 (La. App. 1973); *Central Cab Co. v. Clarke,* 259 Md. 542, 270 A.2d 662 (1970); *Suritz v. Kelner,* 155 So.2d 831 (Fla. App. 1963). *See also,* Annot., 45 A.L.R. 2d 5 (1956);[8] Comments, New Developments in Legal Malpractice, 26 Am. U. L. Rev. 408 (1977); Wade, The Attorney's

---

[8] This annotation states at 14:

Unlike the cases of medical malpractice, however, actions against attorneys have rarely involved questions of the necessity and admissibility of expert testimony, probably because in such cases the court itself sits as an expert on the subject.

Liability for Negligence, 12 Vand. L. Rev. 755, 766 (1959);[9] Note, Attorney Malpractice, 63 Colum. L. Rev. 1293 (1963).

, Several cases, however, have held that expert testimony is required in particular circumstances. *Wright v. Williams,* 47 Cal.App.3d 802, 121 Cal. Rptr. 194 (1975), where the attorney held himself out as a legal specialist in maritime law; *Baker v. Beal,* 225 N.W.2d 106 (Iowa 1975); *Sanders v. Smith,* 83 N.M. 706, 496 P.2d 1102, *cert. den.* 83 N.M. 698, 496 P.2d 1094 (1972); *Olson v. North,* 276 Ill. App. 457 (1934).

We agree with the reasoning of the majority of courts that in some situations proof of negligence may be sufficiently clear, as in the instant case, without the aid of experts. Thus, in a case where expert testimony is not required, it is for the trial court to determine the reasonable standard of care, skill, and diligence which must be exercised by an attorney. *Watkins v. Sheppard, supra* at 892; *Central Cab Co. v. Clarke, supra,* 259 Md. at 551, 270 A.2d at 667.

Most courts agree that the application of the standard of care to specific fact situations and the issue of whether or not the attorney has breached the duty of care owed is a question for the jury. *Starr v. Mooslin,* 14 Cal. App.3d 988, 92 Cal. Rptr. 583 (1971); *Ishmael v. Millington,* 241 Cal. App.2d 520, 50 Cal. Rptr. 592 (1966); *Suritz v. Kelner, supra; Olson v. North, supra.*

As in ordinary negligence actions, the burden of proving proximate cause by the preponderance of the evidence is on the client who alleges negligence on the part of the attorney. *Christy v. Saliterman,* 288 Minn. 144, 179 N.W.2d 288 (1970);

---

[9] Leon Wade, in his article in the Vanderbilt Law Review, *supra* at 776, made the following observation:

More attention will probably be given in the future to the need for expert evidence. In many types of situations such as letting the statute of limitations run before a suit is filed, no testimony of a lawyer is needed. When the problem is one of interpretation of law, there is more likely to be a resort to expert evidence to explain the matter to the jury. But even here, the judge understands the problem without such testimony, and there is little likelihood of the adoption of the rule in the physician cases that expert evidence is required. There is no real indication, however, that the decision as to negligence will be treated as one of law, to be determined by the court.

*Toomer v. Breaux,* 146 So.2d 723 (La. Ct. of App. 1962); *Niosi v. Aiello,* 69 A.2d 57 (D.C. 1949); Restatement (Second) of Torts § 433B(1) (1965);[10] Prosser on Torts §38 (4th ed. 1971). *See* Annot., 45 A.L.R.2d 5, *supra.* The plaintiff need not, however, prove that the defendant's negligence was the sole proximate cause of injury. *Lysick v. Walcom,* 258 Cal. App.2d 136, 157, 65 Cal. Rptr. 406, 418 (1968), *Ishmael v. Millington, supra,* 241 Cal. App.2d at 525-26, 50 Cal. Rptr. at 598; *Modica v. Crist,* 129 Cal. App.2d 144, 148, 276 P.2d 614, 616 (1954); *Ward v. Arnold,* 52 Wash.2d 581, 584, 328 P.2d 164, 166 (1958).[11]

In cases where reasonable persons might differ on the issue, of proximate cause, the question is one for the jury. *Ishmael v. Millington, supra;* Restatement (Second) of Torts,

---

[10] Section 433B, Restatement (Second) of Torts, states:

Burden of Proof

(1) Except as stated in Subsections (2) and (3), the burden of proof that the tortious conduct of the defendant has caused the harm to the plaintiff is upon the plaintiff.

(2) Where.the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.

(3) Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

Comment *a* to § 433B states that the plaintiff is required to produce evidence that the conduct of the defendant has been a *substantial factor* in bringing about the harm suffered. To sustain his burden, proof must be by a preponderance of the evidence. Plaintiff must make it appear more likely than not that the conduct of the defendant was a substantial factor in bringing about the harm.

[11] Comment *b* to Restatement (Second) of Torts § 433B on burden of proof states:

The plaintiff is not, however, required to prove his case beyond a reasonable doubt. He is not required to eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. . . . .

*supra*, § 434(2)(a);[12] Prosser on Torts, supra, § 45.[13] Where reasonable persons would not dispute the absence of causality, however, the court may take the decision from the jury and treat it as a question of law. *Ishmael v. Millington, supra,* 241 Cal. App.2d at 525-26, 50 Cal. Rptr. at 595.

In situations involving more than one probable cause of a plaintiff's injury and where there is conflicting evidence on this issue, the question of proximate cause remains a jury question. *Mitchell v. Branch*, 45 Haw. 128, 363 P.2d 969 (1961); *Young v. Honolulu Construction & Draying Co.*, 34 Haw. 426 (1938); *Hughes v. McGregor*, 23 Haw. 156 (1916); *Ward v. Inter-Island Steam Navigation Co.*, 22 Haw. 66 (1914); *aff'd* 232 F. 809 (1916).

In *Ward v. Inter-Island Steam Navigation Co., supra,* this court said at 71-72:

> The inquiry must, therefore, always be *whether there was an intermediate cause disconnected from the primary fault, and self-operating, which produced the injury. . . .* In the nature of things, there is in every transaction a succession of events, more or less dependent upon those preceding, and it is the *province of a jury* to look at this succession of events or facts, and ascertain whether they are naturally and probably connected with each other by a continuous sequence, or are dissevered by new and independent agencies, . . . . (Emphasis added.)

---

[12] Section 434(2) states:

It is the function of the jury to determine, in any case in which it may reasonably differ on the issue,

(a) whether the defendant's conduct has been a substantial factor in causing the harm to the plaintiff, and

(b) the apportionment of the harm to two or more causes.

[13] Section 45, Proximate Cause, Functions of the Court and Jury, states:

In cases where reasonable men might differ — which will include all but a few of the cases in which the issue is in dispute at all — the question is one for the jury.

. . . .

In any case where there might be reasonable difference of opinion as to the foreseeability of a particular risk, the reasonableness of the defendant's conduct with respect to it, or the normal character of an intervening cause, the question is for the jury. . . .

This court also stated that where there is an "intermediate cause disconnected from the primary fault," such as an *intervening* human agency, "self-operating," which comes between the act of negligence and the injury, the negligence alleged is not the proximate cause of injury unless a reasonable and prudent person should have foreseen that his negligent act would set the intervening cause or human agency in motion. *Id.* at 71.

In *Mitchell v. Branch, supra,* 45 Haw. at 136, 363 P.2d at 975, this court stated that the intervening negligence of a third party would relieve the primary party of liability only if the third party's negligence was so "unusual, so out of the ordinary, so unforeseeable as to be unanticipatable from a legal point of view."

The test to determine whether an intervening negligent act is a superseding cause is one of *foreseeability* of the third person's conduct.[14]

In the case of *Struzik v. City and County,* 50 Haw. 241, 437 P.2d 880 (1968), this court held that although a jury may find that two parties were negligent, it would not be inconsistent for the jury to then find that only one party's negligence proximately caused plaintiff's injury. This court at 50 Haw. 244, 437 P.2d 883, said:

> That section [439, Restatement of Torts] states a well-settled rule of law that recovery for personal injuries does not depend on proof that the defendant's negligence was the sole cause of such injuries. A defendant is not relieved of liability for his negligent act although the

---

[14] Restatement (Second) of Torts, *supra,* § 447 states:

The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if

(a) the actor at the time of his nelgigent conduct should have realized that a third person might so act, or

(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person so acted, or

(c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

conduct of another is also a substantial factor in bringing about the injuries. . . . It must be noted, however, that a necessary prerequisite to any such theory of liability is the element of proximate cause. This is to say that, while a defendant may be held liable for damages caused by his negligence despite the fact that the conduct of another concurs in bringing about the harm, he may not be held liable unless his negligence is found, in the first place, to have been a proximate cause of the plaintiff's injuries. Negligence and proximate cause are, of course, separate and distinct elements and both must be proved to impose liability on a defendant. (Citations omitted.)

In *Wimsatt v. Haydon Oil Co., supra,* the plaintiff client sued his former attorneys for negligently omitting to file his personal injury claim within the statute of limitations period. The court said at 911:

It is obvious that Carrico [plaintiff] would never have had to face the problem of limitation, . . . nor of whether to appeal from the court's adverse ruling upon his attempted amended complaint if the attorneys had timely filed his lawsuit. Can the negligent attorneys now escape responsibility because it now appears that Carrico could have had his claim processed if he had pursued the perfect course of legal action? We do not think so, and find the situation at bar to be comparable with those cases which impose liability upon a tortfeasor for the entire damages sustained by one sustaining bodily injuries, even though it is shown that medical treatment of those injuries may have been remiss.

The court found that the second attorney was not negligent since it was not clear that an appeal would have been successful. The court said at 912: "[T]he unsuccessful efforts of his second lawyer fall within the *risk created* by the pleaded negligence of the first lawyers." (Emphasis added.)

The case before us is not unlike that of *Wimsatt v. Haydon Oil Co., supra.* Here there is sufficient evidence on the record for a jury to find that the unsuccessful attempts of attorney Ross to amend appellant's complaint and plead affirmative defenses was a foreseeable risk created by the conduct of

appellee concerning Civil No. 915. It was for the jury, not the judge, to determine whether the intervening act of attorney Ross constituted a superseding cause of appellant's injury thus relieving appellee of liability.[15]

Looking at the record in the light most favorable to appellant, the record shows that although appellee withdrew as counsel on February 6, 1971, the withdrawal was not filed with the court until March 8, 1971. Appellant testified that appellee knew of the May 21, 1969 complaint filed against her in the fifth circuit court, and despite this knowledge, failed to inform appellant of the pending suit. Appellant further testified that she became aware in July, 1971 that she was to appear in court on July 23, 1971; that she attempted to obtain the services of three different attorneys; that she was able to engage attorney Ross on the date set for trial. The transcript

---

[15] The Restatement (Second) of Torts definition of "superseding cause":

§440. Superseding Cause Defined

A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.

Section 442 lists the considerations which are important in determining whether an intervening force is a superseding cause of harm to another:

(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*See* Taylor v. Southwestern Bell Telephone Co.; 483 S.W.2d 330 (Tex. Civ. App. 1972) for an example of the application of section 442 to the concept of "new and independent cause."

of the August 19, 1971 hearing revealed that although Ross felt that certain affirmative defenses should have been pleaded in answer to the complaint and attempted to amend the answer, the court denied the motion. From this evidence the jury could have concluded: (1) that Ross was not negligent in handling appellant's case, or (2) that even if Ross was negligent, his conduct was a foreseeable risk created by appellee's conduct and, therefore, Ross' conduct did not cut off appellee's liability to appellant, *i.e.*, that appellee's conduct was a substantial factor in bringing about appellant's loss. Hence, upon proper instruction from the court on proximate cause,[16] the jury should be permitted to determine appellee's liability.

## B. Proof of Mishandled Litigation.

The trial court found that there was

evidence or questions of fact sufficient to deny the motion [for directed verdict] on the issues of (1) misrepresentation, undue influence, breach of contract, failure of consideration, and other defenses which defendant [*sic*]

---

[16] The trial court's instruction to the jury in E. I. du Pont de Nemours and Co. v. McCain, 414 F.2d 369, 374, n.3 (5th Cir. 1969), cited by appellee, on the definition of proximate cause is instructive:

"Proximate cause" is that cause which in a natural and continuous sequence, unbroken by any *new and independent cause*, produces an event and without which that event would not have occurred. The test of proximate cause is reasonable foreseeableness. That means that the circumstances must have been such that an ordinarily prudent person in the place of the person charged with the wrong, would have reasonably foreseen that some injury or damage of some kind (not necessarily the injury or damage alleged) would in reasonable probability result from his wrongful act. (Emphasis added.)

The court defined "new and independent cause" as follows:

By the term "new and independent cause" is meant that an act or omission of a separate or independent agent which the defendant did not control, destroyed the causal connection between the wrongful act or omission of the defendant and the injuries and damages complained of, and thereby becomes within itself the immediate cause of an injury or damages. *The act or independent agency must have been one which could not have been reasonably foreseen by the defendant in the exercise of ordinary care.* (Emphasis added.)

*Id.* at 375, n. 3.

urges should have been pleaded as affirmative defenses or even as counterclaims in Civil 915, and (2) the standard of care which Mr. Greenstein should have followed as a competent attorney in preparing the answer to the complaint.

We conclude that the above findings of the trial court are well supported by the record.

We are of the opinion that the jury should have been allowed to determine whether the appellant had a good defense in Civil No. 915 if it had been properly pleaded by the appellee.

Reversed and remanded for further proceedings.

*Donald S. Kagawa* for plaintiff-appellant.

*John S. Edmunds* for defendant-appellee.