278 P.3d 382

William Ronald DOLAN, CPA, Special Administrator for the Estate of Rosalinda ITURRALDE and Miguel Funes ITURRALDE, aka Mike I. Funes, Successor Personal Representative of the Estate of Arturo Iturralde, Plaintiffs–Appellants, Cross–Appellees,*

v.

HILO MEDICAL CENTER, a Hawai'i Non–Profit Corporation, Hawai'i Health Systems Corporation, a Public Benefit Corporation, State of Hawai'i, Defendants–Appellees, Cross–Appellants and Medtronic Sofamor Danek, USA, a Tennessee Corporation Licensed to do Business in Hawai'i, and Robert Ricketson, M.D., Defendants–Appellees.

No. 28792.

Intermediate Court of Appeals of Hawai'i.

March 30, 2012.

As Corrected April 2, 2012.

---

* Plaintiff-Appellant/Cross-Appellee Rosalinda Iturralde died during the pendency of this appeal and her successors-in-interest were substituted and named as parties. Notwithstanding the references in the text of this Opinion to Rosalinda Iturralde, in her individual capacity and/or as the personal representative of the Estate of Arturo Iturralde, the substituted parties, as reflected in the caption, are now the real-parties-in-interest.

Mark S. Davis, Anne L. Williams, and Robert P. Marx (Davis Levin Livingston), on the briefs, for Plaintiffs–Appellants/Cross–Appellees.

George W. Playdon, Jr., Kelvin H. Kaneshiro, R. Aaron Creps (Reinwald O'Connor & Playdon LLP), on the briefs, for Defendants–Appellees/Cross–Appellants.

Edmund Burke, David Y. Suzuki, Patricia Aburano (Burke McPheeters Bordner & Estes), and Murray S. Levin (Pepper Hamilton LLP), on the briefs, for Defendant–Appellee Medtronic Sofamor Danek USA.

Robert Ricketson, M.D., Defendant–Appellee.

NAKAMURA, Chief Judge, FUJISE and LEONARD, JJ.

Opinion of the Court by LEONARD, J.

Plaintiff–Appellant/Cross–Appellee Rosalinda Iturralde (**Appellant** or, in reference to her individual capacity, **Rosalinda**), individually and in her capacity as personal representative of the Estate of Arturo Iturralde (**Arturo's Estate**), and Defendants–Appellees/Cross–Appellants Hilo Medical Center, Hawai'i Health Systems Corporation, State of Hawai'i (collectively, **HMC**), appeal from the Amended Final Judgment (**Judgment**) of the Circuit Court of the Third Circuit (**Circuit Court**).[1] The Judgment, entered September 10, 2007, awarded various damages against HMC and Defendant–Appellee Robert Ricketson, M.D. (**Dr. Ricketson**). It awarded judgment in favor of Defendant–Appellee Medtronic Sofamor Danek USA, Inc. (**Medtronic**) on all claims.

On appeal, Appellant asserts that the Circuit Court erred in: (1) awarding joint and several damages against HMC in an amount different from the amount awarded by jury against Dr. Ricketson; (2) adopting Medtronic's proposed jury instruction on the substantial change doctrine of products liability; (3) adopting Medtronic's proposed jury instructions and special verdict interrogatory on foreseeability and superseding cause; and (4) failing to hold HMC jointly liable for damages awarded to Rosalinda for negligent infliction of emotional distress (**NIED**). On cross-appeal, HMC asserts that the Circuit Court erred in: (1) failing to apply Hawaii Revised Statutes (**HRS**) § 663–10.5 (Supp.

2006), as amended, to preclude HMC from being held jointly and severally liable in tort; and (2) failing to offset the judgment against HMC by the good-faith settlement of non-party Hawaii Orthopaedics, Inc.

## I. BACKGROUND

### A. *Arturo Iturralde's Medical Care*

Decedent Arturo Iturralde (**Arturo**) was admitted to HMC, a state-owned hospital in Hilo, in January of 2001, for an assessment of increasing weakness in his legs that had resulted in several falls. Dr. Ricketson, an orthopedic surgeon with credentials at HMC, examined Arturo on January 24, 2001. He diagnosed Arturo with degenerative spondylolisthesis L4–5 with stenosis, a condition that exerted pressure on the nerves. This condition could potentially be relieved through spinal fusion surgery, which involved implanting two rods into the spine to form a bilateral fixation. Dr. Ricketson scheduled Arturo for the surgery the following Monday, January 29, 2001.

Dr. Ricketson directed HMC to order an M8 Titanium CD Horizon Kit (**Kit**) from Medtronic, which would contain all the necessary instrumentation and tools, including the two titanium implant rods crucial for the surgery. Because Medtronic did not have the instrumentation portion of the Kit in stock at its Memphis facility, it sent the order in two shipments: one from Memphis and one from Tulane. HMC received both shipments on Saturday, January 27, 2001, at approximately 7:30 pm. The contents were sterilized and sent to the operating room. At no time did any HMC staff complete an inventory of the contents of the Kit, as required by well-established HMC policy. Before Dr. Ricketson commenced the surgery, nurse Vicki Barry advised him that an inventory of the Kit had not been completed. Nevertheless, Dr. Ricketson proceeded with the surgery. He removed portions of Arturo's vertebrae in preparation for implanting the rods.

Over two hours into the operation, when he was ready to affix the two titanium rods to both sides of Arturo's spine, surgical staff

---

1. The Honorable Glenn S. Hara presided.

informed Dr. Ricketson that they could not locate the rods. At trial, several staff testified that they had engaged in an extensive search throughout the hospital, to no avail. A staff member contacted Eric Hanson, the Medtronic sales representative in Honolulu. He could not immediately confirm whether the rods had been shipped. However, he had implant rods available in Honolulu and offered to personally deliver them to HMC within ninety minutes.

Dr. Ricketson's testimony was that he believed that the delay was too risky for the patient. He proceeded with the surgery, absent the titanium rods. He cut a three to four centimeter section from the shaft of a surgical, stainless steel screwdriver included in the Kit. He then implanted the shaft into Arturo's spine, creating an improvised unilateral rod. The screwdriver shaft was not intended or approved for human implantation.

Following the surgery, HMC personnel did not inform Arturo that a screwdriver shaft had been implanted in his spine. Dr. Ricketson issued post-operative orders for Arturo to commence physical therapy and begin walking. Sometime during the next day, Arturo likely sustained one or more falls, and the screwdriver shaft shattered. On February 5, 2001, Dr. Ricketson again operated on Arturo in order to remove the screwdriver pieces and implant the proper titanium rods.

Nurse Janelle Feldmeyer (**Feldmeyer**) had been present during portions of the initial operation and was aware of what Dr. Ricketson had done. She immediately reported the incident to her supervisors. They informed her that it was the surgeon's responsibility to communicate such incidents to the patient. When Dr. Ricketson failed to do so, Feldmeyer resolved to inform Arturo herself. However, she was unable to speak with him because he did not speak English, and the hospital reportedly had posted a security guard at his room.

Feldmeyer made arrangements to discretely obtain the fractured screwdriver shaft after it was removed during the second surgery. After obtaining the shaft, she delivered it to an attorney's office. She then telephoned Rosalinda, Arturo's younger sister and caretaker, and informed her that part of a screwdriver had been implanted into Arturo's back. Rosalinda relayed this information to her brother.

After Arturo was discharged from HMC, his condition steadily worsened. His ability to live independently, ambulate, and care for his personal hygiene declined. He required regular catheterization that had to be performed by close family members or home nursing aides. He was often in great pain; he became depressed, and he reportedly lost the will to keep going.

The titanium rods eventually became dislodged and Arturo underwent two further revision surgeries in Honolulu followed by a period of rehabilitation. After the final surgery, his physical condition continued to decline. He underwent permanent catheterization and suffered from multiple bouts of urosepsis (infection of the urinary tract) resulting in multiple hospitalizations and emergency room visits. He became completely bedridden and ultimately passed away on June 18, 2003, from complications of urosepsis.

### B. *Dr. Ricketson*

HMC extends hospital privileges to health care professionals who, through a credentialing process, document their "current professional competence, good judgment, and adequate physical and mental health, and who adhere to the ethics of their respective professions." At the time Dr. Ricketson applied for hospital privileges at HMC, he had a history of serious professional problems. He was subject to professional disciplinary orders in Oklahoma, Texas, and Hawai'i based on numerous lapses in judgment, including falsifying medical records, violating state and federal drug laws, abusing his authority to write prescriptions, lying to licensing authorities, and failing to report prior actions against his license. On October 13, 2000, the State of Hawai'i had placed Dr. Ricketson on probation for failing to disclose prior disciplinary actions. Despite these serious lapses, HMC granted Dr. Ricketson hospital credentials.

## C. *Relevant Procedural History*

Appellant asserted claims of negligence, negligent credentialing, breach of warranty, and strict liability against the various defendants. Appellant also raised negligence and negligent credentialing claims against non-party Hawaii Orthopaedics, Inc., a professional corporation that employed Dr. Ricketson. A jury trial took place from February 6 through March 13, 2006. The Circuit Court employed the jury in an advisory capacity with respect to the claims against HMC, pursuant to HRS § 662–5 (1993).[2]

The jury returned a special verdict finding Medtronic not liable for any of the claims against it. The jury found that both Dr. Ricketson and HMC were negligent, and their negligence was a substantial factor in causing Arturo's harm. The jury apportioned 65% of the fault to Dr. Ricketson and 35% to HMC. It awarded $307,000 in special damages to Arturo's Estate, $1.7 million in general damages to the Estate, and $170,000 in general damages to Rosalinda. It also awarded $3.4 million in punitive damages against Dr. Ricketson individually. The jury did not apportion any of Arturo's harm to pre-existing injuries.

The Circuit Court had employed the jury in an advisory capacity with regard to the claims against HMC and declined to follow the jury's determination of damages with respect to those claims. The court determined that Arturo suffered general, unadjusted damages in the sum of $2,000,000. The Circuit Court concluded that HMC and Dr. Ricketson were jointly and severally liable and adopted the jury's apportionment of fault. However, the court found that 75% of the damages were attributable to Arturo's pre-existing medical conditions. Accordingly, the Circuit Court concluded that HMC was only jointly and severally liable for 25% of the total damages found by the court.

The Circuit Court further concluded that HMC was not jointly and severably liable for damages to Rosalinda in her personal capacity for NIED based on HRS §§ 663–10.5 (Supp.2006) and 663–10.9 (1993 & Supp.1999), which limit claims for which the State may be held jointly and severally liable. The court reasoned that Rosalinda's claim was derivative of Arturo's injuries and death, and was therefore not within the scope of HRS § 663–10.5 or § 10.9. Accordingly, it limited HMC's joint and several damages to those awarded in favor of Arturo's Estate.[3]

Finally, Appellant had previously reached a good-faith settlement with Hawaii Orthopaedics, Inc. for $200,000, plus a promissory note, payment of which was contingent on the outcome of Appellant's claims. The Circuit Court concluded that HMC was not enti-

---

**2.** This statute provides:

> **§ 662–5. Jury.** Any action against the State under this chapter shall be tried by the court without a jury; provided that the court, with the consent of all the parties, may order a trial with a jury whose verdict shall have the same effect as if trial by jury had been a matter of right.

**3.** On September 10, 2007, an amended final judgment was entered as follows:

a. *Against HMC, awarded to Arturo's Estate upon* Counts *I, II, and VIII of the First Amended Complaint:*

| | | |
|---|---|---|
| General Damages | $ 500,000 | (joint & several with Dr. Ricketson) |
| Special Damages | $ 76,750 | (joint & several with Dr. Ricketson) |

b. *Against HMC, awarded to Rosalinda upon Counts I and II:*

| | | |
|---|---|---|
| General Damages | $ 52,500 | (several liability) |
| **$ 629,250** | **Total Judgment against HMC** | |

c. *Against Dr. Ricketson, awarded to Arturo's Estate upon Counts I and VIII:*

| | | |
|---|---|---|
| General Damages | $ 500,000 | (joint & several with HMC) |
| General Damages | $1,200,000 | (several liability) |
| Special Damages | $ 76,750 | (joint & several with HMC) |
| Special Damages | $ 230,250 | (several liability) |
| Punitive Damages | $3,400,000 | (several liability) |

d. *Against Dr. Ricketson, awarded to Rosalinda upon Count I:*

| | | |
|---|---|---|
| General Damages | $ 110,500 | (several liability) |
| **$5,517,500** | **Total Judgment against Dr. Ricketson** | |

tled to offset its damages by the amount of the settlement pursuant to HRS § 663–15.5 (Supp.2003).

A timely notice of appeal was filed on October 9, 2007. HMC's notice of cross-appeal was filed on October 15, 2007.

## II. *POINTS OF ERROR*

Appellant raises the following contentions in her points of error:

(1) The Circuit Court erred in awarding joint and several damages against HMC in an amount different from those awarded by the jury against Dr. Ricketson;

(2) With respect to Appellant's claims against Medtronic, the Circuit Court erred in its adoption and/or rejection of certain jury instructions and a special verdict form question; [4] and

(3) The Circuit Court erred in failing to hold HMC jointly liable to Rosalinda for negligent infliction of emotional distress, based on a mistaken interpretation of HRS § 663–10.9.

HMC asserts the following points of error on cross-appeal:

(1) The Circuit Court erred in failing to apply HRS § 663–10.5, as amended, which precludes HMC from being held jointly and severally liable in tort; and

(2) If the Circuit Court was correct in holding HMC jointly and severally liable, it erred in failing to offset the judgment by the amount of Hawaii Orthopaedics, Inc.'s good-faith settlement.

## III. *APPLICABLE STANDARDS OF REVIEW*

Statutory interpretation is a question of law reviewable *de novo*. *Lingle v. Hawai'i Gov't Emps. Ass'n, Local 152,* 107 Hawai'i 178, 183, 111 P.3d 587, 592 (2005).

> Our statutory construction is guided by the following well established principles: our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in

the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

> In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

> [The appellate] court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it to discover its true meaning.

*Id.* (citation, internal quotation marks, brackets and ellipses omitted).

> A COL is not binding upon an appellate court and is freely reviewable for its correctness. [The appellate] court ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned.

*Chun v. Bd. of Trs. of Employees' Ret. Sys.,* 106 Hawai'i 416, 430, 106 P.3d 339, 353 (2005) (internal quotation marks, citations, and brackets in original omitted).

"The standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." *Moyle v. Y & Y Hyup Shin, Corp.,* 118 Hawai'i 385, 391, 191 P.3d 1062, 1068 (2008) (internal quotation marks and citation omitted). "Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *Nelson v. Univ. of*

---

4. Specifically, Appellant identifies six alleged errors, which are discussed in Section IV.D. below.

*Hawai'i*, 97 Hawai'i 376, 386, 38 P.3d 95, 105 (2001) (internal quotation marks and citations omitted).

## IV. DISCUSSION

### A. HRS § 663–10.5

██ HMC contends that HRS § 663–10.5, as amended in 2006, precludes it from being held jointly and severally liable in this case. For the reasons discussed below, we disagree.

First, we must consider HRS § 663–10.9, which abolishes joint and several liability except for certain tort claims, including claims for: (1) economic damages against joint tortfeasors in actions involving injury or death; and (2) certain noneconomic damages in actions involving injury or death where the joint tortfeasor's individual degree of negligence is found to be at least 25%. HRS § 663–10.9(1) & (3) (Supp.2010).[5]

HRS § 663–10.5 further limits the joint and several liability of governmental entities. This provision, as in effect at the time Appellant's claims arose, stated in relevant part:

> Notwithstanding sections 663–11 to 663–13, 663–16, 663–17, and section 663–31, in any case where a government entity is determined to be a tortfeasor along with one or more other tortfeasors, the government entity shall be liable for no more than that percentage share of the damages attributable to the government entity.

HRS § 663–10.5 (Supp.2001). Accordingly, this statute limited the claims for which state governmental entities could be held jointly and severally liable.

In *Kienker v. Bauer*, 110 Hawai'i 97, 129 P.3d 1125 (2006), the Hawai'i Supreme Court considered whether HRS § 663–10.5 completely abolished joint and several liability of government entities. There, the plaintiffs sought to hold the State liable for negligent highway design that resulted in a motor vehicle collision. *Id.* at 100, 129 P.3d at 1128. HRS § 663–10.9 permitted joint and several liability for "tort actions relating to the maintenance and design of highways" where the tortfeasor had prior notice of the defect. *Id.* at 101 n.6, 129 P.3d at 1129 n.6 (quoting HRS § 663–10.9(4)).

The State in *Kienker* maintained that HRS § 663–10.5 superseded the exceptions listed in § 663–10.9, thereby entirely abolishing joint and several liability for governmental entities. *Id.* at 104–05, 107–08, 129 P.3d at 1132–33, 1135–36. The supreme court rejected that argument. *Id.* at 107–10, 129 P.3d at 1135–38. It reasoned that at the time the

---

5. HRS § 663–10.9 (Supp.2010) provides:

**Abolition of joint and several liability; exceptions.** Joint and several liability for joint tortfeasors as defined in section 663–11 is abolished except in the following circumstances:

(1) For the recovery of economic damages against joint tortfeasors in actions involving injury or death to persons;

(2) For the recovery of economic and noneconomic damages against joint tortfeasors in actions involving:

(A) Intentional torts;

(B) Torts relating to environmental pollution;

(C) Toxic and asbestos-related torts;

(D) Torts relating to aircraft accidents;

(E) Strict and products liability torts; or

(F) Torts relating to motor vehicle accidents except as provided in paragraph (4);

(3) For the recovery of noneconomic damages in actions, other than those enumerated in paragraph (2), involving injury or death to persons against those tortfeasors whose individual degree of negligence is found to be twenty-five per cent or more under section 663–31. Where a tortfeasor's degree of negligence is less than twenty-five per cent, then the amount recoverable against that tortfeasor for noneconomic damages shall be in direct proportion to the degree of negligence assigned; and

(4) For recovery of noneconomic damages in motor vehicle accidents involving tort actions relating to the maintenance and design of highways including actions involving guardrails, utility poles, street and directional signs, and any other highway-related device upon a showing that the affected joint tortfeasor was given reasonable prior notice of a prior occurrence under similar circumstances to the occurrence upon which the tort claim is based. In actions in which the affected joint tortfeasor has not been shown to have had such reasonable prior notice, the recovery of noneconomic damages shall be as provided in paragraph (3).

(5) Provided, however, that joint and several liability for economic and noneconomic damages for claims against design professionals, as defined in chapter 672, and certified public accountants, as defined in chapter 466, is abolished in actions not involving physical injury or death to persons.

Legislature enacted HRS § 663–10.5, it was aware of the exceptions listed in HRS § 663–10.9, yet failed to expressly override them. *Id.* at 108–09, 129 P.3d at 1136–37. Under its plain language, HRS § 663–10.5 did not express an intent to supersede HRS § 663–10.9. *Id.* at 109, 129 P.3d at 1137. Because the statutes merely overlapped in their subject matter, the court gave full effect to both, holding that the State remained subject to joint and several liability under the provisions of HRS § 663–10.9.[6] *Id.*

Following *Kienker*, HRS § 663–10.5 was amended. The revised statute retained the possibility of joint and several liability claims against the State with regard to the highways provision of HRS § 663–10.9. *See* Conf. Comm. Rep. No. 86, in 2006 Senate Journal, at 942. However, the amended provision expressly abolished joint and several liability against the State for all other claims. *Id.* The relevant provision, as amended in 2006, now reads:

> Any other law to the contrary notwithstanding, *including but not limited to sections 663–10.9*, 663–11 to 663–13, 663–16, 663–17, and 663–31, in any case where a government entity is determined to be a tortfeasor along with one or more other tortfeasors, the government entity shall be liable for no more than that percentage share of the damages attributable to the government entity; *provided that joint and several liability shall be retained for tort claims relating to the maintenance and design of highways pursuant to section 663–10.9.*

HRS § 663–10.5 (Supp.2010) (emphasis added).

The enactment provided that the amendment "shall apply retroactively to the extent permitted by law." 2006 Haw. Sess. Laws 2006, Act 112, § 3 at 326. The Conference Committee Report explained: "To avoid any confusion as to the application of section 663–10.5, HRS, following *Kienker*, this measure is given retroactive application to the extent permitted by law so as to implement its intent without violating accrued or substantive rights." *See* 2006 Senate Journal, at 942 (Conf. Com. Rep. No. 86 on H.B. No. 237). HMC argues that the amendment applies retroactively in this case to abolish its joint and several liability.

After HMC submitted its opening brief, however, the Hawai'i Supreme Court rejected that argument in a similar case. *Kaho'ohanohano v. Dept. of Human Servs.*, 117 Hawai'i 262, 178 P.3d 538 (2008). There, the plaintiffs brought a negligence claim against the State Department of Human Services (**DHS**) for failing to properly investigate and protect a minor from abuse. *Id.* at 266, 178 P.3d at 542. DHS was found jointly and severally liable for negligence under HRS § 663–10.9(1) and (3), the same provisions under which HMC was found to be liable here. *Id.* at 309, 178 P.3d at 585. On appeal, DHS contended that the 2006 amendment to HRS § 663–10.5 applied retroactively to abolish its joint and several liability for negligence claims involving personal injuries or death. *Id.* at 310, 178 P.3d at 586.

The supreme court noted that "[g]enerally, the law disfavors the retroactive application of statutes and rules." *Id.* at 310, 178 P.3d at 586 (citations and original ellipsis omitted). In the case of HRS § 663–10.5, the Legislature provided retroactivity only "to the extent permitted by law" where doing so will not "violat[e] accrued or substantive rights." *Id.* at 311, 178 P.3d at 587 (citation omitted). The court adopted the approach of other jurisdictions in concluding that "a change in the right of recovery is deemed to have altered the parties' vested right and [is] substantive in nature," thereby precluding retroactive application in certain cases. *Id.* at 312–14, 178 P.3d at 588–90. It quoted with approval a Wisconsin decision holding that

---

**6.** HMC asserts that *Kienker* is inapplicable because it dealt only with the highways exception of HRS § 663–10.9. However, the supreme court's reasoning concerning statutory interpretation is applicable to all provisions of that section. *Id.* at 108–10, 129 P.3d at 1136–38. The court did not limit its discussion to the highways exception, but rather discussed HRS § 663–10.9 as a whole. *Id.* Although it also referenced the legislative history particular to the highways exception, the court did so merely to confirm its conclusion, not to limit its conclusion to that exception. *Id.* at 110–11, 129 P.3d at 1138–39.

[a]n existing right of action which has accrued under the rules of common law or in accordance with its principles is a vested property right. [The plaintiff's] negligence claim accrued on the date of his accident and injury. It is the fact and date of injury that sets in force and operation the factors that create and establish the basis for a claim of damages. Contrary to [the tortfeasor's] assertion, it is the date of injury which is the triggering event with respect to the application of [the amendment to the contributor negligence statute]—the date that [the plaintiff's] claim accrued. Included in [his] negligence claim is the right to recover under an unmodified doctrine of joint and several liability since, at the time [his] claim accrued, common law imposed joint and several liability upon any jointly liable person.

*Id.* at 313, 178 P.3d at 589 (quoting *Matthies v. Positive Safety Mfg. Co.,* 244 Wis.2d 720, 628 N.W.2d 842, 852–53 (2001) (internal quotation marks, citations, original brackets, emphasis and footnotes omitted)). Under *Kaho'ohanohano,* "because the plaintiff was entitled to recover under the doctrine of joint and several liability when his claim accrued, the statutory change affected his vested rights." *Id.* at 313–14, 178 P.3d at 589–90 (citation omitted).

Applying this reasoning, the supreme court held that the plaintiffs were entitled to recover under the doctrine of joint and several liability in place at the time their claim accrued, i.e., the date of the injury. *Id.* at 315, 178 P.3d at 591. Accordingly, the 2006 amendment to HRS § 663–10.5 did *not* apply retroactively to bar their claim. *Id.*

The same result is warranted here. Arturo's Estate was entitled to recover under the doctrine of joint and several liability in place at the time of Arturo's injury. The Circuit Court did not err in holding HMC jointly and severally liable.[7]

### B. *HMC's Request for an Offset*

Appellant asserted and settled various negligence claims against non-party Hawaii Orthopaedics, Inc., a professional corporation that employed Dr. Ricketson, and its sole shareholder, Dr. Edward Guttering. The Circuit Court determined the release to be a good faith settlement pursuant to HRS § 663–15.5(b).

HMC contends that the Circuit Court erred in failing to reduce the judgment by the amount of this settlement. HMC argues that, as a joint tortfeasor with Hawaii Orthopaedics, Inc., HMC was entitled to offset its liability pursuant to HRS § 663–15.5(a), which provides, in relevant part:[8]

**663–15.5 Release; joint tortfeasors; co-obligors; good faith settlement.** (a) A release, dismissal with or without prejudice, or a covenant not to sue or not to enforce a judgment that is given in good faith under subsection (b) to one or more joint tortfeasors, or to one or more co-obligors who are mutually subject to contribution rights, shall:

(1) Not discharge any other joint tortfeasor or co-obligor not released from liability unless its terms so provide;

(2) *Reduce the claims against the other joint tortfeasor or co-obligor not released*

7. HMC further maintains that under the pre-2006 doctrine of joint and several liability, HRS § 663–10.5 permitted only joint and several liability for negligent highway maintenance and design claims. *Kaho'ohanohano* disposes of this argument as well. There, DHS asserted a similar argument: that in enacting the 2006 amendment, the Legislature merely sought to confirm its original intent regarding the scope of HRS § 663–10.5. 117 Hawai'i at 315, 178 P.3d at 591. The supreme court rejected that argument and held that the plaintiffs were entitled to recover under joint and several liability for negligence claims involving injury under HRS § 663–10.9(1) and (3). *Id.*

8. Appellant argues that HMC waived this argument by failing to assert it when the Circuit Court determined the settlement was in good faith. However, HRS § 663–15.5 does not require joint tortfeasors to request the reduction at that time. Indeed, as the claims against HMC and Dr. Ricketson had not yet been adjudicated, such a request would likely have been premature. It is therefore sufficient that HMC raised the issue with the Circuit Court below. Appellant also contends that HMC failed to present any evidence at trial of the amount of the settlement. Yet under the plain language of HRS § 663–15.5(a)(2), the amount of the set-off in this case is the consideration paid for the release. No further evidence is required.

*in the amount stipulated by the release, dismissal, or covenant, or in the amount of the consideration paid for it, whichever is greater;* and

(3) Discharge the party to whom it is given from all liability for any contribution to any other joint tortfeasor or co-obligor.

(Emphasis added.)

■ At issue is whether, for purposes of this provision, HMC was a joint tortfeasor with Hawaii Orthopaedics, Inc. The definition of "joint tortfeasors" encompasses "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." HRS § 663–11 (1993).

Appellant contends that the release concerns claims against Dr. Gutteling and not the corporation itself, as evidenced by Dr. Gutteling's personal payment of the settlement.[9] The release, however, names both Dr. Gutteling and Hawaii Orthopaedics, Inc. as releasees and expressly releases all claims against the releasees related to the screwdriver incident. Furthermore, Dr. Gutteling was subject to personal liability for claims against the professional corporation because he allegedly failed to maintain adequate malpractice insurance. *See* HRS § 415A–11(c) (2004). It is immaterial that he personally funded the settlement check.

■ Appellant further argues that Hawaii Orthopaedics, Inc. cannot be a joint tortfeasor with HMC because the former's liability was solely premised on the doctrine of *respondeat superior.* Appellant's theory presumes that because the employer and employee are joint tortfeasors with each other, they cannot also be joint tortfeasors with anyone else. However, a vicariously liable employer "share[s] a common liability" with its employee. *Saranillio v. Silva,* 78 Hawai'i 1, 13, 889 P.2d 685, 697 (1995). Their liability is "a consolidated or unified one." *Id.* at 12, 889 P.2d at 696 (internal quotation marks

and citations omitted). Thus, where the "consolidated liability" of a vicariously liable employer and the liability of a third party result from the "same injury," they are joint tortfeasors. *Id.* at 13, 889 P.2d at 697.

Here, Hawaii Orthopaedics, Inc.'s potential liability concerned the same injury for which HMC was liable: that resulting from Dr. Ricketson's negligence. The Circuit Court therefore erred in concluding that HMC was not entitled to offset its damages.

## C. *The Court's Determination of HMC's Liability*

■ Appellant asserts that the Circuit Court erred in independently determining HMC's liability, resulting in joint and several damages different from those "awarded" by the jury. Appellant reasons that, because the Circuit Court found HMC to be a joint tortfeasor with Dr. Ricketson, it could not award damages against HMC in an amount different from those the jury awarded against Dr. Ricketson. However, because HMC is a part of the Hawai'i Health Systems Corp., a State agency, and for the reasons discussed below, we reject this argument. *See* HRS § 323F–2 (2010) (establishing that Hawai'i Health Systems Corp. is "a public body corporate and politic and an instrumentality and agency of the State").

We start with the proposition that the State has waived its sovereign immunity for tort liability under the State Tort Liability Act. HRS § 662–2 (1993) provides:

> The State hereby waives its immunity for liability for the torts of its employees and shall be liable in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

Appellant contends that, under this provision, HMC must be held jointly and severally liable in the same manner and to the same extent as Dr. Ricketson, a private individual,

---

9. Appellant further suggests that HRS § 663–15.5 is inapplicable when the settling tortfeasor was not a party to the lawsuit. However, that section specifically provides that the existence of a lawsuit is not required. HRS § 663–15.5(g) ("The procedures, rights, and obligations of this

section ... do [] not require the existence of a lawsuit."). The Hawai'i Supreme Court has recognized that a joint tortfeasor need not be a party to the suit. *Gump v. Wal–Mart Stores, Inc.,* 93 Hawai'i 417, 422, 5 P.3d 407, 412 (2000).

i.e., in the amount of the jury verdict on damages. However, HRS § 662–5 provides:

Any action against the State under this chapter shall be tried by the court without a jury; provided that the court, with the consent of all the parties, may order a trial with a jury whose verdict shall have the same effect as if trial by jury had been a matter of right.

■ The State's tort liability waiver in HRS § 662–2 is a general provision that must be read together with similar provisions on the same subject matter. *Richardson v. City & Cnty. of Honolulu*, 76 Hawai'i 46, 55, 868 P.2d 1193, 1202 (1994) (internal quotation marks and citations omitted) ("[L]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other."). Read together, HRS § 662–5 acts as a limitation on the general waiver found in HRS § 662–2. The general waiver does not, then, provide a right to a jury trial for tort actions against state entities. *See Dyniewicz v. Cnty. of Haw.*, 6 Haw.App. 582, 592, 733 P.2d 1224, 1230 (1987) ("Under HRS § 662–5 Plaintiffs are not entitled to a jury trial of its claim against the State unless ... the State consents [and other procedural requirements are satisfied]."). Appellant does not contend that the State consented to a jury trial on the claims against the State.

Other statutory provisions limit the State's tort liability in various ways. As discussed above, HRS § 663–10.5 (Supp.2006) expressly abolishes joint and several liability for state governmental entities except in limited circumstances. Under Appellant's reading of HRS § 662–2, HRS § 663–10.5, as well as HRS § 662–5, would be devoid of any effect. *Richardson*, 76 Hawai'i at 55, 868 P.2d at 1202 (where statutes overlap in their application, effect will be given to both if possible). Appellant acknowledges that the general waiver is limited by HRS §§ 663–10.5 and 663–10.9, precluding joint and several liability except in certain circumstances. Just as those provisions limit the manner in which the State may be held liable "to the same extent as a private individual," so too does the bench trial requirement of HRS § 662–5.

We also reject Appellant's reliance on *United States v. Yellow Cab Co.*, 340 U.S.

543, 555–56, for the proposition that common questions of fact determined by the jury must also bind the court. The Court in *Yellow Cab* discussed the *procedural* solution of holding a single trial with two independent factfinders, the court and the jury. *Id.* It did not adopt the substantive principle that common questions of fact, determined by the jury, are binding on the court. It merely recognized that procedural difficulties do not impose a blanket prohibition on raising claims against private and governmental defendants in the same action. *Id.; see Bates v. Tenco Servs., Inc.*, 132 F.R.D. 160, 164 n.7 (D.S.C.1990) (recognizing that in *Yellow Cab*, the Court rejected the government's argument that holding a single trial with two factfinders would be too complicated, reasoning that such a procedure was no different than trying legal issues to jury and equitable issues to judge in single proceeding); *see also Black v. United States*, 421 F.2d 255, 257–59 (10th Cir.1970) (affirming trial court's independent adjudication of government's joint and several liability in greater amount than damages awarded by jury); *Englehardt v. United States*, 69 F.Supp. 451, 455 (D.C.Md. 1947) ("joint defendants have been tried at one time although the verdict must be separately announced by the judge and by the jury as to the respective defendants") (citations omitted).

Appellant's further argument rests on the supremacy of the jury's award against Dr. Ricketson. Appellant argues that by holding HMC liable for a lesser amount, the Circuit Court compromised the right to a jury trial on the claims against Dr. Ricketson and undermined principles of joint and several liability. The error in Appellant's reasoning lies in the presumption—necessarily at the root of the argument—that the jury's verdict is binding as to Dr. Ricketson's joint liability with HMC. However, under HRS § 662–5, the jury had no ability to render a binding verdict against HMC. It only possessed the ability to do so against Dr. Ricketson *severally* (or jointly with Medtronic). The Circuit Court gave full effect to the jury's determination by entering judgment against Dr. Ricketson in the amount of the verdict.

Thus, the Circuit Court did not err when it concluded that "HRS § 663–10.9 operates to have what would have been a totally several judgment [against Dr. Ricketson], to be joint and several [ ] as to the damages *awarded by the court* pursuant to HRS [§ 662–5]." (Emphasis added.)

In its waiving of sovereign immunity, the State limited its liability to an amount determined by a judge rather than a jury. HMC and Ricketson are joint tortfeasors only to the extent of the court's determination. Here, their joint general damages liability was $500,000, or the 25% of the unadjusted damages determined by the court to be attributable to Arturo's injuries—the other 75% being attributed by the court to pre-existing medical conditions. As a result, Appellant may fully recover from either of the defendants for their shared liability.

■■■ Finally, Appellant contends that by adjudicating HMC's liability, the Circuit Court contravened the requirement of HRS § 663–10.9(3) that joint and several liability attach to defendants whose individual degree of negligence is found to be 25% or more. Yet read together with HRS § 662–5, this provision requires the imposition of joint and several liability only as adjudicated by the court, not the jury. Having determined that HMC's individual degree of negligence was more than 25%, the Circuit Court properly awarded joint and several damages against HMC, to the full extent that the court determined Arturo's injuries to arise out of the subject incident. It therefore complied with HRS § 663–10.9(3).[10]

## D. *Alleged Errors in the Jury Instructions and Special Verdict Form*

Appellant identifies six points of error in which she argues that the Circuit Court erred in its instructions to the jury concerning Appellant's negligence and products liability claims against Medtronic.

The first two contentions relate to the products liability claim against Medtronic.

First, Appellant argues that the Circuit Court erred in giving Instruction 49:

If a defendant presents evidence that the product was substantially changed or modified by someone else before the product reached the consumer or ultimate user or that the product was misused, the plaintiff must then prove that the product was not substantially changed or modified and/or it was not misused. If you determine that the product was substantially changed by someone else prior to its use by the plaintiff, or that the product was misused and such misuse was not foreseeable, you must find that the product was not defective.

Second, Appellant asserts that the Circuit Court erred in failing to give plaintiffs' proposed instruction that:

A product is defective if it lacks an essential part. If you find that the kit of instrumentation shipped by Medtronic did not contain the titanium rods when shipped, you must find that the Medtronic kit was defective.

In the third and fourth instruction-related points of error, Appellant argues that the Circuit Court erred in giving its Instruction 27, rather than the plaintiffs' proposed instruction, on the issue of foreseeability. Instruction 27 provided:

In determining whether a person was negligent, it may help to ask whether a reasonable person in the same situation would have foreseen or anticipated that injury or damage could result from that person's action or inaction. If such a result would be foreseeable by a reasonable person and if the conduct reasonably could be avoided, then not to avoid it would be negligence.

The rejected instruction stated:

In determining whether Medtronic was negligent because it (1) failed to include the titanium rods in the kit it shipped, or (2) failed to notify its agent, the doctor, or Hilo Medical Center that the shipment from Memphis was incomplete, it may help to ask whether a reasonable company in the same situation would have foreseen

---

**10.** Appellant also argues that because HMC brought cross-claims against its co-defendants, and it did not have a right to a bench trial on its cross-claims, the jury's verdict on the issues of apportionment had collateral estoppel effect in the bench trial. This issue was not raised below and therefore need not be addressed on appeal. *See* HRS § 641–2 (Supp.2010).

and anticipated that injury or damage could result from either of the company's failures. You must determine whether the commencement of the surgery without confirming the rods were present was foreseeable. If so, then the failure to take reasonable action to avoid the harm would be negligent. The specific harm that occurred does not have to be foreseeable. Defendant Ricketson's use of the screwdriver was a harm that does not have to be specifically foreseeable.

In the fifth and sixth instruction-related contentions, Appellant argues that the Circuit Court erred in giving Instruction 29 and Special Verdict Interrogatory 5, both concerning superseding cause. The court's instruction provided:

> A superseding cause is an act which relieves a defendant or defendants of responsibility for plaintiffs' injury. To be a superseding cause, an act must: (1) Occur after defendant's conduct, (2) Be a substantial factor in bringing about the injury to plaintiffs, (3) Intervene in such a way that defendant's conduct is no longer a substantial factor in bringing about the injury, and (4) Not be reasonably foreseeable at the time defendant acted or failed to act.
>
> If the act was a normal consequence of the situation created by defendant's conduct, then said act is not a superseding cause.

The interrogatory stated:

> If you answered "Yes" to Question Nos. 1, 3 or 4 as to Defendant Medtronic: Were the actions of Defendant Ricketson a superseding cause of injuries to Arturo Itturalde.

As noted above, the central issue before us is whether, when read and considered as a whole, the Circuit Court's instructions were prejudicially insufficient, erroneous, inconsistent, or misleading. *Moyle*, 118 Hawai'i at 391, 191 P.3d at 1068. We necessarily consider the challenged instructions in the context of the parties' allegations and defenses, the evidence adduced at trial, and the law applicable to the particular issues of fact to be decided.

### 1. *Products Liability and Substantial Change*

▋ First, we consider the contested products liability related instructions. The Hawai'i Supreme Court adopted a standard for strict products liability claims in *Stewart v. Budget Rent–A–Car Corp.*, 52 Haw. 71, 470 P.2d 240 (1970). It articulated the standard as follows:

> [O]ne who sells or leases a defective product which is dangerous to the user or consumer or to his property is subject to liability for physical harm caused by the defective product to the ultimate user or consumer, or to his property, if (a) the seller or lessor is engaged in the business of selling or leasing such product, and (b) *the product is expected to and does reach the user or consumer without substantial change in its condition* after it is sold or leased.

*Id.* at 75, 470 P.2d at 243 (emphasis added). This is, in essence, the rule adopted in the Restatement (Second) of Torts § 402A (1965). *Id.* Under part (b) of that standard, a seller is not liable if the product is delivered "in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed." RESTATEMENT (SECOND) OF TORTS § 402A cmt. g. The plaintiff may recover only if the product was in a defective condition when it left the hands of the seller or manufacturer. *Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 495 A.2d 348, 356 (1985) (citing Restatement (Second) of Torts § 402A cmt. g); *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 42 (Tex.2007). In addition, the plaintiff must prove a causal connection between the defect and the plaintiff's injuries. *Acoba v. Gen. Tire, Inc.*, 92 Hawai'i 1, 16, 986 P.2d 288, 303 (1999). In *Acoba*, the supreme court stated:

> To establish a prima facie claim for strict product liability, the plaintiff has the burden to prove (1) a defect in the product which rendered it unreasonably dangerous for its intended or reasonably foreseeable use; and (2) a causal connection between the defect and the plaintiff's injuries. Proof of defect and causation may be provided by expert testimony or by circumstantial evidence.... Generally, whether a

product is unreasonably dangerous is a question for the trier of fact. *Id.* at 16–17, 986 P.2d at 303–04 (citations, brackets and internal quotation marks omitted).

In *Stender v. Vincent,* 92 Hawai'i 355, 373, 992 P.2d 50, 68 (2000), the Hawai'i Supreme Court further addressed the issue of "substantial change" in the context of a products liability case, adopting a burden-shifting rule. The court observed that not every products liability case involves the issue of substantial change, so it is not reasonable to require a plaintiff to "prov[e] a negative from the onset." *Id.* at 371–73, 992 P.2d at 66–68 (citations omitted). For the rule to apply, the defendant must first allege and adduce some evidence of a substantial change in the product. *Id.* at 372, 992 P.2d at 67. Once the issue is so joined, the plaintiff maintains the ultimate burden of proof that the product was dangerously defective when it left the hands of the defendant manufacturer or distributor. *Id.*

Here, the first sentence of Instruction 49 is consistent, at least in substantial part, with the products liability standards enunciated in *Stewart* and *Acoba,* and the burden-shifting standard adopted in *Stender*—

> If a defendant presents evidence that the product was substantially changed or modified by someone else before the product reached the consumer or ultimate user or that the product was misused, the plaintiff must then prove that the product was not substantially changed or modified and/or it was not misused.

This part of Instruction 49 is also consistent with Medtronics' theory of the case, which was supported by evidence adduced at trial and/or reasonable inferences therefrom. Specifically, Medtronics argued that the Kit provided to HMC was complete and contained the titanium rods that were ordered for Arturo's surgery, but the Kit was "substantially changed or modified" by someone else when the rods were lost or misplaced prior to the surgery. The evidence included a witness who testified that the Kit was complete when shipped, a packing list which included the rods as being packed, testimony concerning a prior incident at HMC in which a portion of a shipment had been misplaced and lost for 3 months, and HMC's head nurse's testimony regarding prior occasions where a surgery was started without all of the equipment that had been shipped for a surgery.

However, Instruction 49 does more than simply state the above-referenced standards. The instruction injects the concept of "misuse" of the product, which is not in-and-of-itself erroneous or necessarily inconsistent with applicable law.[11] And then, the instruction informs the jury that it *must* make certain, critical, factual findings, if there was a substantial change or an unforeseeable misuse of the product:

> If you determine that the product was substantially changed by someone else prior to its use by the plaintiff, or that the product was misused and such misuse was not foreseeable, you must find that the product was not defective.

This part of the instruction has two subparts, both of which require the jury to determine that the product was "not defective" upon the identified circumstances. The jury was told that if either (1) "you determine that the product was substantially changed by someone else prior to its use by the plaintiff ... you must find that the product was not defective" or (2) "you determine ... that the product was misused and such misuse was not foreseeable, you must find that the product was not defective."

As Appellant argues, under the circumstances of this case, and without additional clarification, the first subpart renders Instruction 49 prejudicially insufficient and misleading. A substantial change to a product may negate causation where the alteration, and not the originally defective condition of the product, was the proximate cause of the injury. *See, e.g., Navarro v. George Koch & Sons, Inc.,* 211 N.J.Super. 558, 512 A.2d 507, 516 (N.J.Super.Ct.App.Div.1986) ("a manufacturer can also preclude liability if it can prove that the substantial alteration was the sole cause or the intervening su-

---

11. *See* Note 12 *infra.*

perseding cause of the [injury]"); *accord Sheldon v. W. Bend Equip. Corp.*, 718 F.2d 603, 607–08 (3d Cir.1983). Conversely, liability still attaches if the subsequent alteration was *not* the sole or superseding cause of the injury. *See, e.g., Schooley v. Ingersoll Rand, Inc.*, 631 N.E.2d 932, 938 (Ind.Ct.App.1994); *Fisher v. Walsh Parts & Serv. Co., Inc.*, 296 F.Supp.2d 551, 563–64 (E.D.Pa.2003).

Here, there is no question that at least part of the "product" was substantially changed or modified, particularly from a lay person's point of view. Dr. Ricketson cut up a screwdriver that was part of the Kit and inserted it in Arturo's back, in lieu of titanium rods that were designed for that purpose. However, that fact alone should not have dictated a finding that the Kit was not defective, without regard to the jury's finding on whether the Kit was shipped with or without the titanium rods. If the jury determined that the Kit was shipped without the titanium rods, that determination alone could have supported a finding that the product was defective, notwithstanding Dr. Ricketson's actions. Accordingly, the Circuit Court erred in giving this instruction.[12]

■■■ Erroneous jury instructions are presumptively harmful, Medtronics makes no argument overcoming the presumption of harm, and we cannot conclude that the Circuit Court's error in giving this instruction was harmless error. *See, e.g., Udac v. Takata Corp.*, 121 Hawai'i 143, 149, 214 P.3d 1133, 1139 (App.2009).

■■■ Although identified as a point of error, Appellant makes no argument regarding the Circuit Court's refusal to give the specific proposed instruction that:

> A product is defective if it lacks an essential part. If you find that the kit of instrumentation shipped by Medtronic did not contain the titanium rods when shipped, you must find that the Medtronic kit was defective.

■■■ Therefore, we deem this point waived. Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 28(b)(7).[13] We note, however, that in reformulating a "substantial change" instruction or instructions, the parties and the Circuit Court must be careful to avoid giving an instruction that is misleading. While Medtronics is entitled to an instruction that includes the "without-substantial-change" aspect of the Hawai'i products liability standard,[14] as articulated in *Stewart* and *Stender*, it must be made sufficiently clear that the "substantial change" being argued in the context of the products liability claim is the change or modification to the Kit after its shipment from Medtronics to HMC, i.e., that HMC lost or misplaced the rods, and not the later "changes" made by Dr. Ricketson.

### 2. *Foreseeability & Superseding Cause*

Appellant challenges the Circuit Court's instructions on foreseeability and superseding causes, as pertaining to the negligence claim against Medtronic. Appellant argues that the instructions were erroneous because, *inter alia*, the court's instructions failed to clarify that only the general nature of the harm, rather than its specific nature, need be foreseeable in order to negate a superseding cause.

---

12. Appellant makes no discernible argument concerning the Circuit Court's instruction on the "misuse" of a product. As we conclude that Instruction 49 is otherwise erroneous, we decline to address this issue. *See also Int'l Sav. and Loan Ass'n, Ltd. v. Carbonel*, 93 Hawai'i 464, 473, 5 P.3d 454, 463 (App.2000) ("[A]n appellate court need not address matters as to which the appellant has failed to present a discernible argument.") (citations omitted). We note, however, that it appears that the infirmities in the substantial change aspect of this instruction are also manifested in the misuse portion of the instruction.

13. We note that a trial court's refusal to give a specific instruction, even if that instruction is

relevant under the evidence and correctly states the law, is not error if the point has been adequately and fully covered by other instructions. *See, e.g., Udac v. Takata Corp.*, 121 Hawai'i 143, 149, 214 P.3d 1133, 1139 (App.2009) (citing *Sherry v. Asing*, 56 Haw. 135, 144, 531 P.2d 648, 655 (1975)). By failing to address this point, including citation to applicable authorities, Appellant has failed to demonstrate that this instruction correctly states the law and/or that the instructions to the jury were not otherwise sufficient.

14. The other instructions failed to inform the jury on this part of the products liability doctrine.

■ The Circuit Court's instructions defining legal cause and superseding cause included the following:

An act or omission is a legal cause of an injury if it was a substantial factor in bringing about the injury.

One or more substantial factors such as the conduct of more than one person may operate separately or together to cause an injury or damage. In such a case, each may be a legal cause of the injury.

A superseding cause is an act which relieves a defendant or defendants of responsibility for plaintiffs' injury.

To be a superseding cause, an act must:

1. Occur after defendant's conduct,

2. Be a substantial factor in bringing about the injury to plaintiffs,

3. Intervene in such a way that defendant's conduct is no longer a substantial factor in bringing about the injury, and

4. Not be reasonably foreseeable at the time defendant acted or failed to act.

*If the act was a normal consequence of the situation created by defendant's conduct, then said act is not a superseding cause.*

(Emphasis added.) Although the superseding cause instruction is identical in all material respects to Hawai'i Standard Civil Jury Instruction 7.2, appellate courts are not bound by pattern jury instructions. *State v. Mark,* 123 Hawai'i 205, 219, 231 P.3d 478, 492 (2010).

■ A superseding cause severs the original tortfeasor's liability. *Mitchell v. Branch,* 45 Haw. 128, 132–33, 363 P.2d 969, 973–74 (1961). Whether a subsequent cause constitutes a superseding cause is a factual question that turns on foreseeability. *Ontai v. Straub Clinic & Hosp. Inc.,* 66 Haw. 237, 249, 659 P.2d 734, 743 (1983). A subsequent cause of injury, including the negligence of a third party, is *not* a superseding cause if it is reasonably foreseeable. *Brown v. Clark Equip. Co.,* 62 Haw. 530, 540, 618 P.2d 267, 274 (1980). Only in an "extraordinary" case will intervening negligence constitute a superseding cause. *Mitchell,* 45 Haw. at 135, 363 P.2d at 975. "Foreseeability is a crucial aspect of a superseding cause analysis." 57A Am.Jur.2d *Negligence* § 583. Thus, we examine the sufficiency of these instructions with particular care.

The Hawai'i Supreme Court addressed a similar jury instruction issue in *Knodle v. Waikiki Gateway Hotel, Inc.,* 69 Haw. 376, 742 P.2d 377 (1987). There, a guest was murdered at the Waikiki Gateway Hotel. *Id.* at 381–82, 742 P.2d at 382. Her father sued the hotel on a negligence theory. *Id.* at 382, 742 P.2d at 382. The supreme court held, *inter alia,* that the jury instructions regarding superseding cause were defective. *Id.* at 392–93, 742 P.2d at 387–88. As pertinent to this case, the court found error in the instruction concerning foreseeability, which read: "An act is reasonably foreseeable if it appears to have been ordinary or usual under all the circumstances then existing." *Id.* at 393, 742 P.2d at 387–88. The court noted, "We fail to see how murder can be 'ordinary or usual' under any circumstance. We could say the same about lightning striking at any given place or time; yet since 'the possibility is there, . . . it may require precautions for the protection of inflammables.'" *Id.* (citation omitted). The supreme court concluded that the trial court erred in employing the "ordinary or usual" language. *Id.* The test for reasonable foreseeability is not "whether the act or risk appears to have been ordinary or usual under all the circumstances." *Id.* (internal quotation marks and citation omitted). Instead, the appropriate standard is whether "there is some probability of harm sufficiently serious that a reasonable and prudent person would take precautions to avoid it." *Id.* (internal quotation marks, brackets, and citation omitted).

■ Here, the instruction utilizes synonymous words and conveys the same erroneous concept as the instruction in *Knodle.* The Circuit Court's instruction charges: "If the act was a *normal consequence* of the situation created by defendant's conduct, then said act is not a superseding cause." (Emphasis added.) Without further clarification, the instruction suggests that if the subsequent act is *not* what a reasonable person would consider to be a "normal consequence" of the situation created by defendant's conduct, then said intervening act *is* a superseding cause. Thus, it wholly fails to convey the

relevant standard—whether the probability of harm is "sufficiently serious that a reasonable and prudent person would take precautions to avoid it." *Knodle,* 69 Haw. at 393, 742 P.2d at 388 (citation omitted).

As in *Knodle,* the "normal consequence" language improperly tipped the scales in favor of the conclusion that Dr. Ricketson's negligence was *not* foreseeable. A reasonable person would be hard-pressed to consider a surgeon's improvised act of implanting a sawed-off screwdriver into a patient's spine to be a "normal consequence" of Medtronic's (alleged) failure to ship the rods. Under the correct standard enunciated in *Knodle,* however, the jury might have reached a different conclusion.

 Appellant's related contention that the instruction could have misled the jury by failing to clarify that only the general nature of the subsequent harm need be foreseeable is also well-taken. A tortfeasor need not have foreseen the precise nature of the resulting injury or the exact manner in which it occurred. *See Taylor–Rice v. State* 91 Hawai'i 60, 77, 979 P.2d 1086, 1103 (1999) (intervening tortfeasor's actions were reasonably foreseeable even though exact nature of injury was not); 57A Am. Jur. 2d *Negligence* § 587. Where the resulting harm is within the "scope of risk" created by the original tortfeasor's conduct, the particular nature of the harm need not have been foreseeable. *See* RESTATEMENT (SECOND) OF TORTS § 442B. Instead, the relevant inquiry is whether the harm was "one of the cluster of harms in a generally foreseeable category." *Winschel v. Brown,* 171 P.3d 142, 147 (Alaska 2007) (internal quotation marks omitted) (quoting Dan B. Dobbs, The Law of Torts 336 (2001 &

Supp. 2007)); *see also Corey v. Jones,* 650 F.2d 803 (5th Cir.1981) (trial court erred in refusing to instruct the jury that the particular injuries need not be foreseeable). Here, in conjunction with the instruction on superseding cause, the Circuit Court failed to clarify that only the general nature of subsequent harm need be foreseeable. The jury may have been left with the impression that Medtronic could not be liable unless it was specifically foreseeable that Dr. Ricketson would implant a sawed-off screwdriver into Arturo's spine.[15] Accordingly, we conclude that the Circuit Court prejudicially erred in failing to clarify that the precise nature of the injuries need not be foreseeable.

 We reject, however, Appellant's assertion that the Circuit Court should not have given *any* instruction or included a special verdict question on superseding cause and that the issue should have been decided by the court. An instruction on superseding cause was clearly warranted by the record, as it was a core facet of Medtronic's defense. Moreover, the evidence could have supported either outcome. It was properly an issue for the jury. *Mitchell,* 45 Haw. at 139, 363 P.2d at 977 ("Where there is conflicting evidence . . . on the issue of proximate causation, the question is one for the trier of fact."). Thus, the Circuit Court did not err in instructing and querying the jury on superseding cause; rather, it erred in providing an incomplete instruction on the issue.[16]

 We also reject Appellant's contention that the Circuit Court reversibly erred in failing to give the jury plaintiffs' foreseeability instruction, set forth above, instead of Instruction 27. Although separately identi-

15. Also, we note inconsistencies in the jury's special verdict responses that are indicative of confusion on the issue of superseding cause. The jury answered "no" as to whether Medtronic was negligent. However, it answered "yes" as to whether Dr. Ricketson's actions were a superseding cause of Arturo's injuries, relieving Medtronic of liability. If the jury understood the instructions, it should not have reached the superseding cause issue unless it first found Medtronic to have been negligent.

16. Although not raised as a separate point of error and not identified as an issue raised in the

trial court, Appellant appears to argue that the Circuit Court erred in failing to give an instruction that negligent medical treatment is a foreseeable result of an injury. We decline to find plain error here, as that "black letter law" clearly applies to a situation where a defendant's negligence legally caused an injury that was then aggravated by medical negligence. *See, e.g., Montalvo v. Lopez,* 77 Hawai'i 282, 300, 884 P.2d 345, 363 (1994). We cannot conclude that such an instruction clearly and fully states the applicable law under the circumstances of this case. Appellant cites no authorities supporting that proposition and we find none.

fied as points of error, Appellant makes no discernible argument that the court's instruction, and/or the failure to give its alternative instruction, caused the jury instructions as a whole to be prejudicially insufficient, erroneous, inconsistent or misleading. In substantial part, Instruction 27 appears to state the same negligence principle set forth in the plaintiffs' proposed instruction, except without the plaintiffs' inclusion of specific "facts" particular to this case. The plaintiffs' proposed instruction also included that the specific harm that occurred does not have to be foreseeable. We have agreed that the Circuit Court erred in failing to include this proposition in its instructions. However, we cannot conclude that the Circuit Court plainly erred in failing to articulate the law with the fact-specific references requested by the plaintiffs. Appellant cites no legal authority in support of this proposition and we find none. Moreover, the specific wording proposed by the plaintiffs appear to be impermissibly suggestive of certain factual determinations, including a determination that Medtronics failed to include the titanium rods in the Kit. We conclude that the Circuit Court did not plainly err in phrasing Instruction 27 generically, as opposed to couching its instruction in terms of the specific facts of this case.

### E. Rosalinda's NIED Claim

■ Finally, Appellant argues that the Circuit Court erred in concluding that HMC could not be jointly and severally liable for damages awarded to Rosalinda for her NIED claim. We agree.

The Circuit Court adopted the advisory jury's conclusion that HMC was liable for Rosalinda's NIED claim. However, it concluded that "Rosalinda's damages are not involving injury to her, being derivative of the injuries and/or death of Arturo, and thus, the provisions of section 663–10.5 operate to impose several liability on HMC to the extent attributable to it."[17] Accordingly, it only awarded several damages against HMC on the NIED claim.

As discussed above, HRS § 663–10.9 abolishes joint and several liability except for certain types of claims. See supra Section IV.A. It preserves joint and several liability for, inter alia, actions "involving injury or death[.]" HRS § 663–10.9(1), (3). The Circuit Court apparently concluded that under HRS § 663–10.9, HMC could not be jointly liable for the NIED claim because it did not involve injury.

Our case law has amply recognized that NIED claims involve injuries, albeit those of a non-physical nature. In a seminal case, the Hawai'i Supreme Court rejected the "physical injury" rule requiring NIED plaintiffs to demonstrate some level of physical injury. Rodrigues v. State, 52 Haw. 156, 173, 472 P.2d 509, 520 (1970); see also Doe Parents No. 1 v. State, Dep't of Educ., 100 Hawai'i 34, 69, 58 P.3d 545, 580 (2002) (discussing significance of Rodrigues ). It thereby recognized mental distress as "a legally cognizable injury." Larsen v. Pacesetter Sys., Inc., 74 Haw. 1, 42–43, 837 P.2d 1273, 1294 (1992) (discussing Rodrigues ). The court reasoned that an NIED claim is essentially "a negligence claim in which the alleged actual injury is wholly psychic[.]" Doe Parents No. 1, 100 Hawai'i at 69, 58 P.3d at 580. Where "the alleged actual injury is for psychological distress alone," an NIED claim achieves compensation for "persons who have sustained emotional injuries attributable to the wrongful conduct of others." Id. at 68, 58 P.3d at 579 (internal quotation marks and citation omitted). The court has therefore repeatedly recognized that the essence of an NIED claim involves psychological injury. Id. at 69, 58 P.3d at 580.

An NIED claim is only "derivative" in the sense that it generally does not arise absent a "predicate injury either to property or to another person" that is separate from the claimant's psychological injury. Id. at 69, 58 P.3d at 580. Here, Arturo's injuries and death comprise the requisite predicate injury. Rosalinda's NIED claim for her own

---

17. The Circuit Court's reliance on HRS § 663–10.5 is puzzling. As discussed above, it correctly concluded that HMC remained subject to joint and several liability for actions "involving injury or death" under section 663–10.9, despite the language of HRS § 663–10.5. See infra Section IV.A. It thus appears that the court based its conclusion on HRS § 663–10.9, not HRS § 10.5.

injuries, however, is "independent and separate" from those of Arturo. *Torres v. Nw. Eng'g Co.*, 86 Hawai'i 383, 404–05, 949 P.2d 1004, 1025–26 (App.1997) (quoting *Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 361, 944 P.2d 1279, 1304 (1997) (internal quotation marks and citation omitted)). Because HRS § 663–10.9 does not limit "injury" to those of a physical nature, we conclude that it extends to NIED claims. As a result, the Circuit Court erred in failing to hold HMC jointly and severally liable for damages attributable to Rosalinda's NIED claim.

## V. CONCLUSION

For the foregoing reasons, the Circuit Court's September 10, 2007 Judgment is vacated and this case is remanded for further proceedings consistent with this opinion.